## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| American Bankers Association,<br>Credit Union Strategies Task Force of<br>Pennsylvania and The Legacy Bank, | : <br> : <br> : <br> : | Docket No. |
| Plaintiffs, | : <br> : | |
| | : | Filed Electronically |
| *vs.* | : <br> : | |
| National Credit Union Administration, | : | **COMPLAINT** |
| Defendant. | : <br> : | |

## <u>NATURE OF THIS ACTION</u>

1.      Plaintiffs bring this complaint for relief under 5 U.S.C §§ 702 -706;

28 U.S.C. §§ 2201 & 2202; and the Federal Credit Union Act, 12 U.S.C. § 1751 *et*

*seq*., to challenge approvals by the National Credit Union Administration of

applications for community charters made by Members 1st Federal Credit Union,

New Cumberland Federal Credit Union and AmeriChoice Federal Credit Union.

## JURISDICTION

2.      This action arises under 5 U.S.C. § 701 *et seq*., and the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.*, and this Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

3.      Venue is properly laid in this District under 28 U.S.C. § 1391.

## PARTIES

4.      The American Bankers Association (the "ABA") is the largest national trade association representing the banking industry in the United States. The ABA represents commercial and savings banks and savings and loans associations operating in all fifty states.  The ABA, on behalf of its members, monitors and seeks to enforce competitive fairness in the regulation of financial institutions.

5.      The Credit Union Strategies Task Force of Pennsylvania ("CUSTF") is an alliance between the Pennsylvania Bankers Association ("PBA") and the Pennsylvania Association of Community Bankers ("PACB").  CUSTF was formed to represent the members of the PBA and the PACB and its mission is to ensure fair competition between credit unions, banks and savings associations providing financial services to residents of and business located in the counties, cities, boroughs and townships that are within the geographic area to be served by Members 1st Federal Credit Union, New Cumberland Federal Credit Union and

2

AmeriChoice Federal Credit Union pursuant to the community charters at issue in this proceeding.

6.     The PBA is a trade association representing the interests of banks and savings associations located throughout Pennsylvania.  The PBA works with its members to ensure fair and even-handed regulation of all financial institutions with operations in Pennsylvania.

7.     The PACB is a trade association representing the interests of community banks and savings associations located throughout Pennsylvania.  Like the PBA, the PACB works with its members to ensure fair and even-handed regulation of all financial institutions with operations in Pennsylvania.

8.     The Legacy Bank is a financial institution chartered by the Pennsylvania Department of Banking doing business in many of the counties, cities, boroughs and townships that are located within the geographic area that make up the field of memberships approved by the National Credit Union Administration for Members 1st Federal Credit Union, New Cumberland Federal Credit Union and AmeriChoice Federal Credit Union.

9.     The National Credit Union Administration ("NCUA") is an agency of the United States Government and is responsible for administering the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.* (the "Credit Union Act"), throughout the United States.

# BACKGROUND

## A. Community Charters Under the Credit Union Act

10.     Federal credit unions are mutually owned financial institutions chartered and regulated by the NCUA pursuant to the Credit Union Act.  Federal credit unions benefit from significant tax and regulatory advantages over banks that compete with them for business.

11.     The Credit Union Act authorizes the NCUA to charter three types of credit unions, each defined by a different "field of membership":  single common-bond credit unions; multiple common-bond credit unions; and community credit unions.  12 U.S.C. § 1759(b).  This complaint involves three community credit unions recently chartered by the NCUA.

12.     In August 1998, in response to the Supreme Court's decision in National Credit Union Administration v. 1st National Bank & Trust Co., et al., 522 U.S. 479 (1998) (ruling in favor of ABA and invalidating NCUA's policy of chartering multiple group credit unions), Congress passed the Credit Union Membership Access Act ("CUMAA").

13.     CUMAA was compromise legislation, providing greater flexibility to federal credit unions in some areas, but imposing greater restrictions in others.

14.     With respect to its limiting effect, CUMAA imposed a new "local" restriction on community credit unions.  The field of membership for a community

4

credit union is now limited to "[p]ersons or organizations within a well-defined
<u>local</u> community, neighborhood, or rural district" 12 U.S.C. § 1759(b)(3)
(emphasis added). In prior law, the word "local" did not appear.

15. NCUA has acknowledged that "the word 'local' was . . . intended to
be more limiting than previous policies." NCUA Letter No. 99-FCU-2 (June
1999). Similarly, NCUA has stated that Congress' new requirement that a well-
defined community be "local" imposed a "more circumspect and restricted
approach to chartering community credit unions." 63 Fed. Reg. at 72,012 (Dec.
30, 1998). The NCUA also stated that a community credit union has a new burden
"to demonstrate more definitively how it meets the local requirement." *Id*.

### B. NCUA's Implementing Regulations and Policies

16. To meet the new constraints of CUMAA, the NCUA promulgated
Interpretive Ruling and Policy Statement 99-1, as amended on October 27, 2000,
March 20, 2001, and April 24, 2002 (collectively referred as "IRPS 99-1"). IRPS
99-1 was incorporated into the NCUA's regulations at 12 C.F.R. § 701.1. Among
other things, IRPS 99-1 limits the field of membership for community credit
unions and provides that applicants for community charters must document the
existence of a well-defined, local community, neighborhood or rural district.

17.     With respect to community credit unions, IRPS 99-1, in relevant part, provides the following limits on the scope of membership for a community credit union:

> NCUA policy is to limit the community to a single, geographically well-defined area where individuals have common interests or interact.
>
> .   .   .
>
> NCUA has established the following requirements for community charters:
>
> - The geographic area's boundaries must be clearly defined;
>
> - The charter applicant must establish that the area is a 'well-defined local, community, neighborhood, or rural district'; and
>
> - The residents must have common interests or interact.
>
> .   .   .
>
> 'Well-defined' means the proposed area has specific geographic boundaries.  Geographic boundaries may include a city, township, county (or its political equivalent), or clearly identifiable neighborhood.
>
> .   .   .
>
> The meaning of local community, neighborhood, or rural district includes a variety of factors.  Most prominent is the requirement that the residents of the proposed community area interact or have common interests.  In determining interaction and/or common interests, a number of factors become relevant.  For example, the existence of a single major trade area, shared governmental or civic facilities, or area newspaper is significant evidence of community

6

interaction and/or common interests. Conversely, numerous trade areas, multiple taxing authorities, and multiple political jurisdictions, tend to diminish the characteristics of a local area.

Population and geographic size are also significant factors in determining whether the area is local in nature. A large population in a small geographic area or a small population in a large geographic area may meet NCUA community chartering requirements. For example, an ethnic neighborhood, a rural area, a city, and a county with 300,000 or less residents will generally have sufficient interaction and/or common interests to meet community charter requirements. While this may most often be true, it does not preclude community charters consisting of multiple counties or local areas with populations of any size from meeting community charter requirements.

Conversely, a larger population in a large geographic area may not meet NCUA community chartering requirements. It is more difficult for a major metropolitan city, a densely populated county, or an area covering multiple counties with significant population to have sufficient interaction and/or common interests, and to therefore demonstrate that these areas meet the requirement of being "local." In such cases, documentation supporting the interaction and/or common interests will be greater than the evidence necessary for a smaller and less densely populated area.

In most cases, the 'well-defined local community, neighborhood, or rural district' requirement will be met if (1) the area to be served is in a recognized single political jurisdiction, i.e., a county or its political equivalent or any contiguous political subdivisions contained therein, and if the population of the requested well-defined area does not exceed 300,000 or (2) the area to be served is in multiple contiguous political jurisdictions, i.e. a county or its political equivalent or any political subdivisions contained therein and if the population of the requested well-defined area does not exceed 200,000.

18.     In response to requests from representatives of federal credit unions

seeking even greater freedom to compete with banks and other financial

institutions, the NCUA adopted Interpretive Ruling and Policy Statement 03-1

("IRPS 03-01") and, effective May 15, 2003, the NCUA amended its regulations to replace the reference to IRPS 99-1 with a reference to IRPS 03-01.

19.     Like IRPS 99-1, IRPS 03-01 provides:  "Community charters must be based on a single, geographically well-defined local community, neighborhood, or rural district where individuals have common interests and/or interact."

20.     IRPS 03-01 also represents a change in policy, as advocated by federal credit unions.  For example, although it had previously cautioned the regulated community that "not every large city will qualify as a local community," in IRPS 03-01, the NCUA opines that the "well-defined local community, neighborhood, or rural district requirement is met if the area to be served is in a recognized single political jurisdiction, i.e., a city, county, or their political equivalent, or any contiguous portion thereof."

21.     Similarly, by IRPS 03-01, the NCUA liberalized its policy regarding proposed fields of membership consisting of multiple contiguous political jurisdictions by opining that, if the population of a proposed "community" does not exceed 500,000, then the community charter applicant must provide the NCUA with nothing more than a letter describing how the area meets the standards for community interaction and/or local interests.  The same *de minimis* documentation requirement applies if the proposed community is a Metropolitan Statistical Area, or a portion thereof, and the population does not exceed 1,000,000.

22.     If an applicant for a community charter proposes a field of membership other than one of the pre-determined areas identified IRPS 03-01, consistent with IRPS 99-1, IRPS 03-01 requires applicants for community charters to identify a proposed field of membership and to "include documentation to support that it is a well-defined local community, neighborhood, or rural district."

## MEMBERS 1st FEDERAL CREDIT UNION COMMUNITY CHARTER

23.     In or about March 2003, Members 1st Federal Credit Union ("Members 1st") sought NCUA approval for a field of membership consisting of Adams, Cumberland, Dauphin, Lebanon, Perry, York and portions of Franklin Counties, Pennsylvania.

24.     The field of membership, *i.e.*, the purported "well-defined local community," proposed by Members 1st has a population of more than 1.1 million (2000 census), spans more than 3,400 square miles and includes three cities, 90 boroughs, 140 townships, 115 municipal authorities, 38 water and sewer authorities, 21 school authorities, 8 solid waste authorities, 9 economic development authorities, 5 parking authorities, 5 mass transit authorities, 4 hospital authorities, 2 airport authorities and 7 authorities organized for special purposes.

25.     Without meaningful public notice that it was considering the Members 1st application, and with the only evidence before it consisting of self-serving, largely unsubstantiated assertions by Members 1st together with a handful

9

of documents of questionable authenticity, on April 24, 2003, the NCUA approved the Members 1st community charter application.

26.    The NCUA claims to have applied and relied on IRPS 99-1 when it approved the Members 1st community charter application.  The NCUA's contemporaneous explanation for its decision appears in its Board Action Memorandum and the transcript of the proceedings during which it approved the Members 1st community charter application.  True and correct copies of the NCUA's Board Action Memorandum and the transcript of proceedings are attached hereto as Exhibits A and B respectively.

27.    As set forth below, acting contrary to law and arbitrarily and capriciously, the NCUA suppressed any meaningful chance for individuals and entities likely to be affected by the Members 1st application to present facts and data regarding the proposed field of membership.  Further, the NCUA conducted a materially inadequate review of the application, relying in some instances on superseded data and otherwise ignoring readily-available, public information that any similarly-situated finder of fact would reference.

28.    The public information ignored by the NCUA overwhelmingly evidences that the field of membership proposed in the Members 1st application (and in the subsequent New Cumberland and AmeriChoice community charter

10

applications) is not a "well-defined local community, neighborhood, or rural district."  12 U.S.C. § 1759(b)(3).

> **A.    The NCUA's Fact-Finding and the Administrative Record In Connection With the Members 1st Application Are Materially Inadequate.**

29.    In connection with its consideration of the Members 1st community charter application, the NCUA acted without due regard to the rights and privileges of all interested parties and adversely affected persons.

30.     The NCUA, without cause or justification, failed to provide persons and entities that might be adversely affected by its decision with meaningful notice and an opportunity to be heard.  Potentially affected persons were effectively excluded from the administrative process, thus ensuring an incomplete and inadequate administrative record.

31.    The fact-finding conducted by the NCUA in connection with its consideration of the Members 1st community charter application was materially inadequate.  Absent effective notice, the NCUA did not hear from persons and entities opposed to or otherwise interested in the Members 1st application.

32.    In addition, the NCUA did not inquire into the validity, accuracy or reliability of the limited evidence submitted by Members 1st in support of its application.

33.     Rather than inquire into the basis and accuracy of Members 1st's representations and submissions, the NCUA abandoned any pretense of impartiality and accepted the information submitted by Members 1st at face value. The NCUA, in this manner, abdicated its responsibility to engage in reasoned fact-finding.

34.     Having failed to adopt a process that would result in, and having otherwise failed to engage in, adequate fact-finding, the NCUA based its approval of the Members 1st community charter application on facts that either are not supported by evidence in the administrative record or which, if the fact-finding had been adequate and the record complete, would be have been shown to be incorrect. Misapplying or failing to consider the relevant factors, among other oversights, the NCUA failed to consider evidence of: (i) numerous governmental organizations and classifications inconsistent with the purported single community identified by Members 1st; (ii) multiple, distinct trade areas within the purported single community; and (iii) the lack of evidence of common interests shared by, and interaction between, the citizens of the many different communities found within the proposed field of membership.

**B.** **The NCUA Failed To Consider Evidence That State and Federal Government Does Not Consider The Members 1st Field of Membership To Be A "Well-Defined Local Community."**

35.     Despite the reasonable availability of public documents and other evidence overwhelmingly supporting the contrary proposition, the NCUA erroneously concluded that "Pennsylvania government views this area [*i.e.,* the field of membership authorized for Members 1st] as one unit … and provides support and oversight to residents through their regional planning and governmental districts."  (Exhibit B at F0066)

36.     The NCUA disregard the fact that the single "community" proposed by Members 1st actually consists of three cities, 90 boroughs, 140 townships and 214 local authorities.

37.     The NCUA also improperly relied upon an Executive Directive (Gubernatorial Executive Directive 48 of 1972) that is no longer in force and effect and that is expressly addressed to a state agency (the Office of State Planning and Development) that is no longer in existence and then failed to consider that, rather than treat the Members 1st field of membership as a single community, currently, the Governor's Center for Local Government Services divides it among three, distinct planning regions.  4 Pa. Code § 1.4; Governor's Center for Local Government Services, *Directory of Council of Governments*.

38.     The NCUA similarly failed to consider that, in addition to the Governor's Center for Local Government Services, numerous other public agencies within the Commonwealth of Pennsylvania, including the Departments of Education, Labor and Industry, Conservation and Natural Resources, Health and Revenue, divide the seven-county area which constitutes the Members 1st field of membership as parts of two or more separate and distinct planning regions.

39.     The NCUA also failed to consider that the Members 1st field of membership includes five separate councils of government created by intergovernmental cooperation agreements operating within five distinct geographic regions, *i.e.,* Perry County, Upper Dauphin County, the West Shore Area, Western Cumberland County and the Central York Area.

40.     The NCUA also failed to consider a determination by the United States, Office of Management and Budget ("OMB") in 1998 that the field of membership consists of two, distinct "metropolitan areas."  OMB Bulletin, 98-06 (June 23, 1998).  Moreover, the NCUA's conclusion that the Members 1st field of membership consists of a single local, community is inconsistent the OMB's determination, based on 2000 census data, that the purported "community" is made up of four separate Core Based Statistical Areas each of which separately has a "high degree of social and economic integration."  65 Fed. Reg. 82228-38 (December 27, 2000).  Similarly, NCUA's conclusion is inconsistent with the fact

that the OMB has not grouped the four separate Core Based Statistical Areas together into a single Core Based Statistical Area or as part of a Combined Statistical Area.  OMB Bulletin 04-03 (June 6, 2003).

41.    The NCUA's conclusion is also inconsistent with published reports by the Bureau of Economic Analysis of the United States Commerce Department ("BEA"), which conclude, among other things, that the Members 1st field of membership consists of two separate Component Economic Areas in which Cumberland, Dauphin, Lebanon and Perry Counties constitute a distinct Component Economic Area from Adams and York Counties.  *See, e.g.,* "Redefinitions of BEA Economic Areas," U.S. Commerce Dept., Survey of Current Business (Feb. 1995); "2004 Revision of BEA Economic Areas" (Nov. 2004).

42.    The NCUA also did not consider that five separate community mass transit systems exist within the Members 1st field of membership.

43.    Finally, the NCUA did not consider published reports prepared by the University of Pittsburgh which, based on an evaluation of how twenty-one different categories of local government services are delivered, ranked the Harrisburg/Lebanon/Carlisle Metropolitan Statistical Area and the York Metropolitan Area respectively as the 9th and 18th most fragmented metropolitan areas within the entire United States.  *See* Miller, *The Regional Governing of*

*Metropolitan America,* Westview Press (Feb. 2002); Rusk, "Little Boxes, Limited Horizons:  A Study of Fragmented Local Governance in Pennsylvania," Brookings Institution Center on Urban and Metropolitan Policy (Dec. 2003).

**C.    The NCUA Failed To Take Into Account Evidence of Multiple, Distinct Trade Areas Within the Purported Community.**

44.    Despite the reasonable availability of public documents and other evidence overwhelmingly supporting the contrary proposition, the NCUA arbitrarily and capriciously concluded that the field of membership approved for Members 1st constitutes a "major trade area … that has melted together largely as a result of development along the I-83 corridor" which "draws residents from throughout the community for business, shopping and entertainment."

45.    The NCUA failed to consider publicly available data regarding residence-to-work commuting patterns within the seven county area assembled by the United States Census Bureau based on the 2000 Census clearly evidencing a lack of interaction, as a result of commuting, between the many distinct trade areas within the Members 1st field of membership, including a lack of any substantial commuting north and south along the I-83 corridor.

46.    Despite the reasonable availability of public documents and other evidence overwhelmingly supporting the contrary proposition, the NCUA also erroneously concluded, without any support in the record, that residents within the Members 1st field of membership "travel up and down I-83 to satisfy specific

16

unique shopping needs" at the Camp Hill, Capital City, Harrisburg East, Colonial Park, West Manchester and York Galleria Malls.

47.     The NCUA failed to consider evidence that shopping centers in York County operate within a separate and distinct market from shopping centers in Cumberland and Dauphin County.

48.     The NCUA also failed to take into account the fact that population, employment and development patterns and comprehensive plans prepared by Cumberland, Dauphin and York Counties illustrate that the primary focus of historic and anticipated future development is east and west along major highway networks, rather than north and south along I-83 (which has experienced and is targeted for less intensive, mixed-use development).

49.     In addition, contrary to the NCUA's unsupported assertions that the Harrisburg and York areas have "melted together" because of development along the I-83 corridor, substantial portions of the corridor remain sparsely populated and substantially rural in character.

50.     Similarly, contrary to the NCUA's unsupported assertions, "all major highways in the area" do not "naturally flow inward toward the I-83 area connecting Harrisburg and York." Instead, most of the major highways in the area, *i.e.,* I-76, I-81, I-283, Route 11, Route 15, Route 22, Route 322 and Route 422

flow in and out of the Harrisburg Area and the remaining major artery, Route 30, flows east and west connecting Gettysburg, York and Lancaster.

**D. The NCUA Overlooked The Notable Absence Of Evidence of Common Interests and Interaction.**

51.     The NCUA concluded contrary to law, without substantial evidence and despite extensive, readily available evidence to the contrary, that residents within the approved Members 1st field of membership share common interests and interact through the use of common facilities, organizations, clubs and through sharing common newspapers and periodicals.

52.     In determining that individuals who live, work, worship and attend school throughout the approved field of membership interact and share common interests, the NCUA capriciously disregarded the lack of any local or regional unit of government with jurisdiction over the approved field of membership for purposes of providing any type of governmental service.

53.     When it approved the Members 1st field of membership, the NCUA failed to consider readily available evidence of at least seven different Chambers of Commerce operating within the approved field of membership each charged with the mission of improving commerce within the distinct region it serves.

54.     When it approved the Members 1st field of membership, the NCUA also failed to consider readily available evidence of the operation of at least five individual tourism promotion agencies within the approved field of membership.

18

55.     The NCUA also capriciously disregarded readily available evidence
of the segmentation of institutions of higher education in the several distinct and
separate communities within the approved field of membership.  For example, the
NCUA ignored evidence that  Dickinson College, Penn State Law School and the
Army War College are clustered together in the Carlisle area; that the Academy of
Medical Arts and Business, Central Pennsylvania College, Dixon University
Center, Harrisburg Community College Main Campus, Harrisburg Institute of
Trade and Technology, the Harrisburg University of Science and Technology, ITT
Technical Institute, Messiah College, Penn State Capitol Campus, Thompson
Institute, and Widener Law School are clustered together in the Harrisburg area;
that Penn State York Campus, York College, Yorktown Business Institute and
York Technical Institute are clustered together in the York area; and that
Shippensburg University, Gettysburg College, and Lebanon Valley College are
located are very distinct locations isolated from the remaining institutions in
Shippensburg, Gettysburg and Lebanon.

56.     Likewise, when it approved the Members 1st community charter, the
NCUA capriciously disregarded readily available evidence demonstrating that
primary and secondary public education is not provided on an area-wide basis
within the approved field of membership.  Among other things, the NCUA failed
to consider readily available evidence that primary and secondary public education

within the approved field of membership is provided by 47 separate school districts and that school districts are organized into six separate regions for the operation of vocational and technical schools.

57.     When it approved the Members 1st community charter, the NCUA capriciously disregarded readily available evidence that medical facilities within the field of membership primarily serve distinct communities rather than the entire field of membership.

58.     When it approved the Members 1st community charter, the NCUA capriciously disregarded readily available evidence demonstrating that private groups and organizations do not share interests and interact throughout the approved field of membership, but instead operate in separate, distinct and highly segmented local communities.  The groups that maintain separate and distinct operations in the many local communities found within the field of membership include the United Way, the American Red Cross, the Boy Scouts and Girl Scouts of America, Big Brothers and Big Sisters, the Association for Retarded Citizens; the YMCA and YWCA, the National Mental Health Association, the American Cancer Society, the American Heart Association, United Cerebral Palsy, the American Lung Association, and the United Jewish Communities Federation.

59.     When it approved the Members 1st field of membership, the NCUA also failed to consider readily available evidence of the organization and operation of libraries in distinct local communities within the approved field of membership.

60.     The NCUA also failed to consider readily available evidence of the segmentation of arts and cultural organizations on an individual community basis within the approved field of membership, thus making it unnecessary for residents of the different communities within the Members 1st field of membership to interact in connection with the arts and entertainment.

61.     When it approved the Members 1st field of membership, the NCUA capriciously disregarded readily available evidence demonstrating that print and broadcast journalism and entertainment resources are highly segmented and localized within the approved field of membership.

62.     When it approved the Members 1st field of membership, the NCUA concluded, without substantial evidence and despite extensive, readily available evidence to the contrary, that major employers and industrial parks within the approved field of membership cluster around the center of community along the I-83 corridor between Harrisburg and York.

63.     The NCUA failed to consider readily available evidence indicating that distinct and separate centers of employment exist in the Carlisle, Gettysburg, Hanover, Harrisburg, Lebanon, Shippensburg and York areas.

64.     When it approved the Members 1st field of membership and designated the same as a well-defined local community, the NCUA ignored evidence in its possession indicating that various geographic areas located within the field of membership themselves constituted separate and distinct local communities.

65.     The NCUA had before it, but chose to ignore, information submitted to it in support of its earlier decision allowing the AmeriChoice Federal Credit Union to serve all of Cumberland County that Cumberland County constitutes a separate, distinct local community with significantly different characteristics than surrounding areas.

66.     The NCUA had before it, but chose to ignore, information submitted to it in support of its June 22, 2000, decision allowing the Patriot Federal Credit Union to serve Franklin County, Fulton County, Washington County in Maryland and Shippensburg Borough, and that Shippensburg is part of a local community centered around Chambersburg and Hagerstown rather than Harrisburg or York.

67.     The NCUA had before it, but chose to ignore, information submitted to it in support of its November 7, 2003 decision allowing the Hershey Federal Credit Union to serve Dauphin and Lebanon Counties indicating that a distinct local community exists in the Hershey Area that extends on both sides of the Dauphin and Lebanon County boundary.

68.     Finally, when it designated the Members 1st field of membership a single, well-defined, local community, the NCUA failed to undertake any evaluation of the limiting geographic characteristics of the approved field of membership such as travel time across the purported community and the existence of significant sparsely populated rural regions and mountain ranges within the purported community.

## AMERICHOICE FEDERAL CREDIT UNION AND NEW CUMBERLAND FEDERAL CREDIT UNION COMMUNITY CHARTER APPLICATIONS

69.     On November 2, 2004, the NCUA approved a community charter application submitted by New Cumberland Federal Credit Union ("New Cumberland") with the same field of membership as the Members 1st community charter.  The NCUA approved the New Cumberland community charter application based on its previous determination, in connection with the Members 1st application, that the field of membership is a well-defined, local community.

70.     On September 19, 2005, the NCUA approved an amended community charter application submitted by AmeriChoice Federal Credit Union ("AmeriChoice") with the same field of membership as the Members 1st community charter.  The NCUA approved the AmeriChoice community charter application based on its previous determination, in connection with the Members 1st application, that the field of membership is a well-defined, local community.

23

71.     The NCUA's approval of the New Cumberland and AmeriChoice community charter applications was arbitrary, capricious, an abuse of discretion and contrary to law and was granted following a materially inadequate fact-finding process undertaken without due regard for the rights and privileges of all interested parties and adversely affected persons.

## INJURY TO PLAINTIFFS AND THEIR MEMBERS

72.     Members of the ABA, the financial institutions whose interests are represented by CUSTF and The Legacy Bank operate within the purportedly well-defined, local community approved as a field of membership in connection with the Members 1st, New Cumberland, and AmeriChoice community charter applications.  These financial institutions, therefore, are in direct competition with Members 1st, New Cumberland and AmeriChoice and are adversely affected by the NCUA's approval of the community charters identified in this complaint.

73.     By reason of the approval by the NCUA of the Members 1st application, ABA, PBA and PACB members, including Legacy Bank, will be subjected to unlawful competition in their business or potential business, which competition would not exist but for the NCUA's unlawful approval of the Members 1st community charter.  The NCUA's approval of the Members 1st application, thus, inflicts and threatens serious competitive injury to ABA, PBA, and PACB members and The Legacy Bank.  The subsequent approval of the New

Cumberland and AmeriChoice community charter applications, given on the immediate coattails of the Members 1st application approval, multiplies the ruinous competition for ABA, PBA and PACB members.

## CLAIMS FOR RELIEF

### Count One

74.    Paragraphs 1 to 73 are incorporated herein by reference.

75.    The NCUA's fact-finding undertaken in connection with the Members 1st community charter application was materially inadequate and conducted without due regard for the rights and privileges of plaintiffs, and members of the plaintiffs, in this case.

76.    The NCUA has failed to adopt or employ a process or procedure to ensure that its decisions on community charter applications are conducted with due regard for the rights and privileges of all adversely affected persons.

77.    A remand to the NCUA for fact-finding in connection with the question of whether the field of membership identified in the Members 1st community charter application constitutes a well-defined, local community, neighborhood or rural district under the Credit Union Act and applicable regulations and policies would be futile and is not otherwise warranted and appropriate in this case.

78.     The field of membership identified in the Members 1st, New Cumberland and AmeriChoice community charter applications is not a "well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b)(3).

79.     Pursuant to 5 U.S.C. § 706(2)(F), following a trial de novo, the NCUA's approval of the Members 1st community charter and the subsidiary determination that the field of membership specified there is a well-defined local community should be held unlawful and set aside as unwarranted by the facts.

## Count Two

80.     Paragraphs 1 to 79 are incorporated herein by reference.

81.     Pursuant to 5 U.S.C. § 706(2)(D), the NCUA's approval of the Members 1st community charter application should be held unlawful and set aside as rendered without observance of procedure required by law in that NCUA acted without due regard to the rights and privileges of adversely affected persons as required by 5 U.S.C. § 558(c).

## Count Three

82.     Paragraphs 1 to 81 are incorporated herein by reference.

83.     The NCUA's approval of the Members 1st community charter application violates the membership limitations imposed by the Credit Union Act on the formation of, and membership in, community credit unions, as set forth in 12 U.S.C. § 1751 *et seq.*

84.     The NCUA disregarded the requirements of IRPS 99-1 and the Credit Union Act and failed to consider all relevant factors.

85.     The NCUA ignored, and thus rendered superfluous, the statutory mandate of the Credit Union Act limiting community charters to well-defined "local" communities, by approving a field of membership that encompasses multiple local communities, neighborhoods and rural districts that, among other things, spans several distinct trade areas and political jurisdictions.

86.     The NCUA's approval of the Members 1st community charter application violates the membership limitations imposed by NCUA policies, including IRPS 99-1 and IRPS 03-01.

87.     Pursuant to 5 U.S.C. § 706(2)(A) & (C), the NCUA's approval of the Members 1st community charter application should be held unlawful and set aside as arbitrary, capricious, an abuse of discretion, in excess of statutory limitations and otherwise not in accordance with law.

## Count Four

88.     Paragraphs 1 to 87 are incorporated herein by reference.

89.     Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, plaintiffs, as persons who are affected by the NCUA's approval of the Members 1st community charter application, are entitled to a declaratory judgment from this Court defining and declaring plaintiffs' rights

under the Credit Union Act. Plaintiffs are entitled to a declaration by the Court that the field of membership identified in the Members 1st community charter is not a well-defined, local community, neighborhood or rural district under the Credit Union Act and that, therefore, the NCUA's approval of the Members 1st application is unlawful, null and void.

## Count Five

90.    Paragraphs 1 to 89 are incorporated herein by reference.

91.    The NCUA's fact-finding undertaken in connection with the New Cumberland and AmeriChoice community charter applications was materially inadequate and conducted without due regard for the rights and privileges of plaintiffs, and members of plaintiffs, in this case.

92.    The NCUA has failed to adopt or employ a process or procedure to ensure that its decisions on community charter applications are conducted with due regard for the rights and privileges of all adversely affected persons.

93.    A remand to the NCUA for fact-finding in connection with the question of whether the field of membership identified in the New Cumberland and AmeriChoice community charter applications constitutes a well-defined, local community, neighborhood or rural district under the Credit Union Act and applicable regulations and policies would be futile and is not otherwise warranted and appropriate in this case.

28

94.     The field of membership identified in the New Cumberland and AmeriChoice community charter applications is not a "well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b)(3).

95.     Pursuant to 5 U.S.C. § 706(2)(F), following a trial de novo, the NCUA's approval of the New Cumberland and AmeriChoice community charters and the subsidiary determination that the field of membership specified there is a well-defined local community should be held unlawful and set aside as unwarranted by the facts.

## Count Six

96.     Paragraphs 1 to 95 are incorporated herein by reference.

97.     Pursuant to 5 U.S.C. § 706(2)(D), the NCUA's approval of the New Cumberland and AmeriChoice community charter applications should be held unlawful and set aside as rendered without observance of procedure required by law in that NCUA acted without due regard to the rights and privileges of adversely affected persons as required by 5 U.S.C. § 558(c).

## Count Seven

98.     Paragraphs 1 to 97 are incorporated herein by reference.

99.     The NCUA's approvals of the New Cumberland and AmeriChoice community charter approvals, which are based solely on the prior approval of the unlawful Members 1st application, violate the membership limitations and

29

requirements placed by the Credit Union Act and IRPS 03-01 on the formation of, and membership in, community credit unions, as set forth in 12 U.S.C. § 1751 *et seq.*, and are therefore unlawful, null and void.

100.   The NCUA's approvals of the New Cumberland and AmeriChoice community charter approvals are arbitrary, capricious, an abuse of discretion, unreasonable and not in accordance with law and, therefore. are unlawful and should be set aside.  5 U.S.C. § 706.

### Count Eight

101.   Paragraphs 1 to 100 are incorporated herein by reference.

102.   Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C §§ 2201 and 2202, plaintiffs, as persons who are affected by the NCUA's approvals of the New Cumberland and AmeriChoice community charter applications are entitled to a declaratory judgment from this Court defining and declaring plaintiffs' rights under the Credit Union Act and IRPS 03-01.   Plaintiffs are entitled to a declaration by the Court that the field of membership identified in the New Cumberland and AmeriChoice community charters is not a well-defined, local community, neighborhood or rural district under the Credit Union Act and that, therefore, the NCUA's approval of the New Cumberland and AmeriChoice community charter applications is unlawful, null and void.

## RELIEF REQUESTED

Wherefore, plaintiffs request that this Court enter judgment, pursuant to 5 U.S.C. § 706; 28 U.S.C. §§ 2201 and 2202; and Rule 57 of the Federal Rules of Civil Procedure:

(1)     Declaring that the field of membership identified in the Members 1st, New Cumberland and AmeriChoice community charters is not "a well-defined local community, neighborhood, or rural district" 12 U.S.C. § 1759(b)(3);

(2)     Holding unlawful, and setting aside, the NCUA's approval of the Members 1st, New Cumberland and AmeriChoice community charter applications;

(3)     Declaring that the NCUA's approval of the Members 1st, New Cumberland and AmeriChoice community charter applications is unlawful, null and void;

(4)     Enjoining the NCUA from approving any other credit union community charter applications with the same field of membership as the Members 1st community charter;

(5)     Enjoining the NCUA from taking any steps to implement, or allow credit unions to implement, a community charter with a field of membership as defined in the Members 1st community charter application;

(6)     Ordering the NCUA to pay plaintiffs' costs; and

31

(7)    Granting such other relief as the Court may find just and reasonable.



Respectfully submitted,
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP


s/  Raymond P. Pepe
Raymond P. Pepe
PA22721
rpepe@klng.com
David R. Overstreet
PA68950
doverstreet@klng.com
Christopher R. Nestor
PA82400
cnestor@klng.com
17 North Second St., 18th Floor
Harrisburg, PA  17101
(717) 231-4500 phone
(717) 231-4501 fax

*Counsel for Plaintiffs*

November 1, 2005