**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMERICAN BANKERS** | : | |
| **ASSOCIATION et al.,** | : | **Civil Action No. 1:05-CV-2247** |
|     **Plaintiffs** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **NATIONAL CREDIT UNION** | : | |
| **ADMINISTRATION et al.,** | : | |
|     **Defendants** | : | |

**<u>MEMORANDUM</u>**

On April 24, 2003, the National Credit Union Administration ("NCUA") approved Members First Credit Union's request to amend its credit-union charter to cover six counties in south-central Pennsylvania.  In doing so, the NCUA determined that the six-county area, which covers over 3,000 square miles and has a population of more than 1.2 million people, constitutes a "well-defined local community."  Plaintiffs, led by the American Bankers Association ("Association"),[1] maintain that the area does not constitute a well-defined local community.  Accordingly, the Association brought suit against the NCUA to challenge the NCUA's approval pursuant to the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.*  Members First Credit Union and two other affected credit unions intervened as defendants.[2]

Before the Court are cross-motions for summary judgment.  (Doc. Nos. 49, 51, 53.)  For the reasons that follow, the Court will grant Plaintiffs' motion for summary judgment.

---

[1] Plaintiffs are the American Bankers Association, the Credit Union Strategies Task Force of Pennsylvania, The Legacy Bank, Adams County National Bank, and Mid Penn Bank.

[2] The other two credit unions are New Cumberland Federal Credit Union, and AmeriChoice Federal Credit Union.

I.      **BACKGROUND**

This case involves the application of two federal statutes, the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Federal Credit Union Act ("FCUA" or "the Act"), 12 U.S.C. § 1751 *et seq.*  In an earlier order, this Court analyzed the scope and applicable standard of review under the APA.  Am. Bankers Ass'n v. NCUA, 513 F. Supp. 2d 190 (M.D. Pa. 2007).  Now the Court will determine whether the NCUA's actions, made under the authority of the FCUA, are lawful under those standards.  To do so, the Court will begin by discussing the statutory and regulatory framework associated with the FCUA, and then will turn to the application process involved in this case.

A.      **Statutory and Regulatory Framework**

1.      ***The Federal Credit Union Act***

The FCUA traces back to the Great Depression, when Congress authorized the chartering of federal credit unions to "serve the productive and provident credit needs of individuals of modest means."  12 U.S.C. § 1751 note (Congressional Findings); Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 485 (1988).  A federal credit union, as defined by the Act, is "a cooperative association organized . . . for the purpose of promoting thrift among its members and creating a source of credit for provident or productive purposes."  12 U.S.C. § 1752(1).

The NCUA, an independent federal agency, is charged with oversight of federal credit unions and is the principal agency responsible for interpreting the FCUA.  12 U.S.C. § 1752a. The NCUA is managed by the National Credit Union Administration Board ("Board"), which is

comprised of "three members, who are broadly representative of the public interest, appointed by the President, by and with the advice and consent of the Senate." § 1752a(b)(1).

The Board is also responsible for reviewing applications to obtain a federal credit union charter.  In order to become a federal credit union, a prospective credit union must submit an "organization certificate" to the Board for approval.  Approval of the organization certificate can be given only after the Board conducts "an appropriate investigation . . . for the purpose of determining (1) whether the organization certificate conforms to the provisions of [the FCUA]; (2) the general character and fitness of the subscribers thereto; and (3) the economic advisability of establishing the proposed Federal credit union."  12 U.S.C. § 1754.

Credit unions share several characteristics under the Act: they are owned and controlled by their members, 12 U.S.C. § 1760; their primary function is to provide loans to members and to other credit unions, 12 U.S.C. § 1757; and they are "exempt from Federal and most State taxes because they are . . . not-for-profit organizations generally managed by volunteer boards of directors and because they have the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means," 12 U.S.C. § 1751 note.  Another significant feature of federal credit unions is that, as Congress has noted, "unlike other depository institutions, credit unions are cooperatives whose members must have a 'common bond.'"  H.R. Rep. 105-472, at 11-12 (1998).

The existence of a common bond is of paramount importance to credit unions.  As Congress found, the presence of "a meaningful affinity and bond among members, manifested by a commonality of routine interaction, shared and related work experiences, interests, or

activities, or the maintenance of an otherwise well-understood sense of cohesion or identity is essential to the fulfillment of the public mission of credit unions." 12 U.S.C. § 1751 note.

Under present law, the FCUA recognizes three types of credit unions, distinguished by their "fields of membership": (1) a single common-bond credit union, (2) a multiple common-bond credit union, and (3) a community credit union. 12 U.S.C. § 1759(b). Until 1998, the FCUA limited credit unions' fields of membership to "groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." 12 U.S.C. § 1759 (1994). After the Supreme Court's decision in National Credit Union Administration v. First National Bank & Trust Co., 522 U.S. 479, 485 (1988), which interpreted the FCUA to require that "the *same* common bond of occupation . . . unite each member of an occupationally defined federal credit union," id. at 502, Congress enacted the Credit Union Membership Access Act, Pub. L. No. 105-219,112 Stat. 913, to amend the acceptable fields of membership. Of particular significance to this case is the fact that, as part of that act, Congress changed the acceptable field of membership from a "well-defined neighborhood, community, or rural district" to a "well-defined *local* community, neighborhood, or rural district." § 1759(b)(3) (emphasis added).

### 2.   *Interpretive Rule Policy Statement 99-1*

The FCUA does not define what constitutes a well-defined local community, neighborhood, or rural district. Instead, Congress delegated the responsibility to "prescribe, by regulation, a definition for the term" to the NCUA. 12 U.S.C. § 1759(g)(1). The NCUA did so in Interpretative Rule Policy Statement 99-1 ("IRPS 99-1"), 63 Fed. Reg. 71998 (Dec. 30, 1998), as amended by 66 Fed. Reg. 15,619 (Mar. 20, 2001); see also Am. Bankers Ass'n v. NCUA, 93

F. Supp. 2d 35, 47 (D.D.C. 2000) ("Based on its experience of administering community credit unions and its extensive analysis responding to the commentary it received under the notice-and-comment period, the NCUA designed a viable policy for carrying out Congress's mandate."), aff'd, 271 F.3d 262 (D.C. Cir. 2001).

IRPS 99-1 established three requirements for community charters: (1) "[t]he geographic area's boundaries must be clearly defined"; (2) "[t]he charter applicant must establish that the area is a 'well-defined local, community, neighborhood, or rural district'"; and (3) "[t]he residents [in the area] must have common interests or interact." 63 Fed. Reg. 72037.[3] Though the NCUA concluded that the "addition of the word 'local' to the previous statutory language was intended as a limiting factor and that additional clarification was required relative to what would qualify as a community charter," 63 Fed. Reg. 72012, the NCUA ultimately interpreted the requirement to be flexible in application. Rather than identify specific limits or criteria, the NCUA identified various factors, including population size and geographic size, that would be considered in deciding whether proposed area qualified as a well-defined local community. In particular, IRPS 99-1 explained that

> A large population in a small geographic area or a small population
> in a large geographic area, may meet NCUA community chartering

---

[3] The Association argues that the Court should incorporate into IRPS 99-1 a "distinctiveness" requirement from an earlier Interpretative Rule Policy Statement, IRPS 94-1. The argument goes as follows: Because IRPS 94-1 required that a community be "distinct" and because the NCUA intended IRPS 99-1 to be more restrictive than IRPS 94-1, IRPS 99-1 must also minimally require that a well-defined community be distinct. However, the Association implicitly assumes that IRPS 99-1 must be more rigorous in *each* case, which is not necessarily true. IRPS 99-1 may take a "more circumspect and restricted *approach* to chartering community credit unions," 63 Fed. Reg. 72012 (emphasis added), but that is not the equivalent to concluding that if a specific proposed community would not pass muster under IRPS 94-1 then it necessarily must fail under IRPS 99-1.

> requirements.  For example, an ethnic neighborhood, a rural area, a city, and a county with 300,000 or less residents will generally have sufficient interaction and/or common interests to meet community charter requirements.  While this may most often be true, it does not preclude community charters consisting of multiple counties or local areas with populations of any size from meeting community charter requirements.
>
> Conversely, a larger population in a large geographic area may not meet NCUA community chartering requirements.  It is more difficult for a major metropolitan city, a densely populated county, or an area covering multiple counties with significant population to have sufficient interaction and/or common interests, and to therefore demonstrate that these areas meet the requirement of being "local." In such cases, documentation supporting the interaction and/or common interests will be greater than the evidence necessary for a smaller and less densely populated area.

63 Fed. Reg. 72037.

More fundamentally, in addition to considerations of geographical area and population, the NCUA concluded that an applicant must demonstrate that residents have common interests or interact.  The NCUA stated that whether residents interact or share common interests could be evaluated by reference to a set of nonexclusive factors:

> [T]he existence of a single major trade area, shared governmental or civic facilities, or area newspaper is significant evidence of community interaction and/or common interests.  Conversely, numerous trade areas, multiple taxing authorities, and multiple political jurisdictions, tend to diminish the characteristics of a local area.

Id.

Rather than require every applicant to provide a detailed explanation as to whether the community charter requirements were satisfied, IRPS 99-1 established a "streamlined" approach to facilitate review.  Pursuant to the streamlined approach, the NCUA recognized two types of proposed areas that would "presumptively" be considered well-defined local communities: (1) a

single political jurisdiction with a population of fewer than 30,000 people and (2) multiple contiguous political jurisdictions with a combined population of fewer than 20,000 people.  If the proposed area fell into either of these two categories, the NCUA generally only required "the credit union [to] submit a letter describing how the area meets the standards for community interaction or common interests."  63 Fed. Reg. 72037-38.[4]

If, however, the proposed area did not fall under either category—as was the case here—the NCUA required a credit union to submit "documentation to support that [the area] is a well-defined local community, neighborhood, or rural district" and provide a "narrative summary" to "demonstrate the relevance of the documentation provided in support of the application [and] explain how the documentation demonstrates interaction or common interests." Id.  The rule set forth "examples of acceptable documentation," including:

> • The defined political jurisdictions;
>
> • Major trade areas (shopping patterns and traffic flows);
>
> • Shared/common facilities (for example, educational, medical, police and fire protection, school district, water, etc.);
>
> • Organizations and clubs within the community area;
>
> • Newspapers or other periodicals published for and about the area;
>
> • Maps designating the area to be served. One map must be a regional or state map with the proposed community outlined.  The other map must outline the proposed community and the identifying geographic characteristics of the surrounding areas; or

---

[4] Incidentally, the streamlined approach provides further evidence against incorporating a distinctiveness requirement into IRPS 99-1.  See note 3, supra.  If a proposed community is a single political jurisdiction with fewer than 30,000 people, then under the streamlined approach of IRPS 99-1 that proposed community is presumptively a well-defined local community, irrespective of the distinctiveness of that proposed community.

• Other documentation that demonstrates that the area is a community where individuals have common interests or interact.

63 Fed. Reg. 72038, as amended by 66 Fed. Reg. 15619, 15621 (Mar. 20, 2001).

Finally, IRPS 99-1 identifies "examples of community fields of membership" and provides a few examples of "unacceptable" fields of membership. Among the acceptable fields of membership are: "Persons who live, work, worship, or attend school in, and businesses located in the area of Johnson City, Tennessee, bounded by Fern Street on the north, Long Street on the east, Fourth Street on the south, and Elm Avenue on the west"; "Persons who live or work in Green County, Maine"; "Persons who live, worship, or work in and businesses and other legal entities located in Independent School District No. 1, DuPage County, Illinois"; "Persons who live, worship, work, or attend school at the University of Dayton, in Dayton, Ohio"; and "Persons who work for businesses located in Clifton Country Mall, in Clifton Park, New York." Id. at 72038-89. Examples of unacceptable field of memberships under IRPS 99-1 are: "Persons who live or work in the Greater Boston Metropolitan Area" and "Persons who live or work in the State of California." 63 Fed. Reg. 72039. Those two fields of membership are unacceptable because they do "not meet the definition of local community, neighborhood, or rural district." 63 Fed. Reg. 72039.

**B.      The Credit Unions' Applications**

As briefly discussed above, this case concerns the NCUA's conclusion that a six-county area in the south-central region of Pennsylvania constitutes a well-defined local community, which was made when the NCUA Board approved the conversion of Members 1st Federal Credit

Union ("Members 1st")[5] to a community charter credit union.  Although that decision was made

in April 2003, the process that led to that decision began in October 2001.  During those two

years, Members 1st submitted four versions of its community-charter application.  Because the

application process of Members 1st is central to this case, the Court will review the process in

substantial detail.[6]

### 1.    The October 2001 Application

The process to convert Members 1st to a community charter credit union began on

October 2, 2001, when it filed its application to the NCUA Regional Office.  In the application,

Members 1st submitted a proposed eight-county area—consisting of Adams, Cumberland,

Dauphin, Franklin, Lancaster, Lebanon, Perry, and York counties—which it dubbed the "South

Central Pennsylvania Community" ("SCPC").  At the time, more than 1.7 million residents lived

in the SCPC, which spanned approximately 5,100 square miles.

The NCUA Regional Office denied the application, finding that "the narrative summary

[did] not explain how the documentation that was provided demonstrates interaction or common

interests," A.R. 1157, and concluded that the SCPC did not comprise a single, local, well-defined

---

[5] Members 1st was initially chartered in 1950 to serve "commissioned, enlisted, and civilian personnel of the United States Naval Supply Depot in Mechanicsburg, Pennsylvania." A.R. 1162.  By the time it sought to convert its charter, Members 1st had grown to cover over 628 employee groups and had 83,190 members.

[6] After the NCUA approved Members 1st's conversion to a community charter, two other federal credit unions, New Cumberland Federal Credit Union and AmeriChoice Federal Credit Union, applied to convert their charters.  Because the NCUA had already approved the proposed area as a well-defined local community, the NCUA did not undertake any further analysis with respect to its conclusion that the six-county area met the requirements of IRPS 99-1.  See A.R. 1362, 1643.  Accordingly, though both New Cumberland Federal Credit Union and AmeriChoice Federal Credit Union are defendants in this case, the Court will not describe their applications.

community where residents interact or have common interests.  The NCUA Regional Office

stated that the factors cited by Members 1st "showed the presence of multiple educational

institutions, healthcare facilities, media, shopping centers, and varied religious affiliations, which

tend to contradict the notion of a local community where residents interact or have common

interests."  A.R. 1158.  After a factor-by-factor review of Members 1st's application, A.R. 1158-

59, 1163-67, the NCUA Regional Office stated that:

> The applicant failed to show that [the SCPC] comprise[s] a single,
> local, well-defined community where residents interact or have
> common interests.  Although there are fixed boundaries formed by
> the political jurisdictions, there is insufficient evidence that the
> residents have common interests or interact.  The presence of
> multiple educational institutions, healthcare facilities, media,
> shopping centers, varied religious affiliations, and the distance
> residents would have to travel to get to major facilities, suggest the
> opposite.
>
> While one prominent organization indicates that the eight-county area
> participates in joint endeavors, other key sources, such as the Tri-
> County Regional Planning Commission, Pennsylvania's Home Page,
> and [the] Lebanon-Harrisburg-Carlisle MSA, define the region
> differently (three, seven, or four counties, respectively).  There is
> evidence of interaction among residents of the counties immediately
> adjacent to the City of Harrisburg through employment, commuting
> patterns, and trade, corresponding to the four-county Lebanon-
> Harrisburg-Carlisle MSA.  However, there was no evidence to show
> how residents of Adams, Franklin, Lancaster, and York counties
> interact or have common interests with Cumberland, Dauphin,
> Lebanon, and Perry [counties].
>
> Therefore, the application does not meet the requirements
> establishing a well-defined community . . . .

A.R. 1167.  Accordingly, the NCUA Regional Office denied the application and provided

Members 1st with information on appeal and reconsideration procedures.  A.R. 1159.

10

## 2.    The "revised" application for reconsideration

Members 1st then made a formal request for reconsideration.  The NCUA Regional

Office agreed and, on April 29, 2002, after several time extensions, Members 1st submitted a

"revised" application.  A.R. 1122.  In the revised application, Members 1st maintained that the

SCPC constituted a well-defined local community and provided supplemental information and

an expanded narrative summary.

The NCUA Regional Office again rejected Members 1st's proposed area.  On

reconsideration, the NCUA Regional Office stated that "[d]espite the additional narrative and

documentation provided, there is insufficient evidence to establish that [the SCPC] is a 'local'

community where residents interact or have common interest."  A.R. 1103.  The office further

stated that "[t]he presence of several well-populated counties, with their own trade areas, taxing

authorities, media, and services, tends to dilute the characteristics of the larger, eight-county area

as one local community."  A.R. 1105.  And, again, after a factor-by-factor review of the

application, the NCUA Regional Office concluded:

> There are well-defined fixed boundaries formed by political
> jurisdictions, and there is evidence the community has long been
> viewed as one cohesive unit for government planning and
> administrative purposes, and allocation of financial resources.  There
> is one major airport, one major trauma center, educational institutions
> that attract primarily local residents, inter-scholastic competitions,
> recreation, cultural activities, clubs, community organizations, and
> community events.
>
> However, there is no evidence the community has one major trade
> area.  Harrisburg is centrally located within the community, and
> much of the area's government, commerce, transportation, education,
> culture, community organizations, and media are located there.
> Harrisburg and its environs are not as well-populated as Lancaster
> and York Counties, which have larger workforces, most of whom
> commute to work within their home county.  Lancaster has the largest

11

shopping facilities, attracting a large number of shoppers. Further research suggests the presence of numerous trade areas within the region. These factors diminish the concept of a local community.

* * *

The applicant has not provided sufficient documentation to show that [the SCPC] is a single, local, well-defined community where residents interact or have common interests. The population distribution and commuting patterns obtained via census data and other independent, verifiable sources, do not demonstrate the existence of a local community to the extent required for a community common bond for an application of this magnitude under IRPS 99-1 as amended by IRPS 00-1 and IRPS 01-1.

A.R. 1115. Thus, the "revised" application was denied. A.R. 1159.

### 3.    The November 2002 "Draft" Application

Though Members 1st did not appeal the NCUA Regional Office's decision, it was not the end of the application process. After a meeting held between NCUA staff and representatives of Members 1st on August 29, 2002, see A.R. 1102, Members 1st indicated that it would modify its "original application by reducing the geographical area and associated population of [the] proposed 'community,'" id. Members 1st stated that it had "been closely monitoring the community charters approved by the NCUA Board, with particular attention [paid] to the recent NCUA Board comments encouraging credit unions to work with their Regional Office to structure a community charter application that addresses the concerns of the applicable regulations and the NCUA Board." Id.

After this meeting, Members 1st submitted its November 2002 "draft" application to the NCUA Regional Office. Unlike the previous applications, in which Members 1st sought to serve the eight-county SCPC, in the draft application Members 1st proposed an area covering only six counties, which it called the "Capital Area Community" ("CAC"). A.R. 884. The CAC, which

12

included all of the SCPC except Lancaster County and most of Franklin County,[7] had a population of more than 1.1 million people and covered over 3,000 square miles.

After a review of the draft application, the NCUA Regional Office provided observations and recommendations to Members 1st. In particular, the office observed that "[t]he requested area consists of two [Metropolitan Statistical Areas ("MSAs")], and one county. To tie the MSAs together, it must be demonstrated that there is interaction or common interest among the two." A.R. 877. The office then recommended that "[a] review of the draft application and research on the Internet suggests a good approach is to focus on the trade area formed by the [Interstate] 83 Corridor between Harrisburg and York. There are numerous malls, employers, fairgrounds, parks, hospitals, etc., along or within a few miles of the Interstate." A.R. 877. Moreover, the office stated that "[g]iven the information provided in the application indicating [that] transportation corridors all lead to Harrisburg, if it can be demonstrated that they all lead toward the *Harrisburg-York corridor*, the notion of community would be considerably strengthened." A.R. 877. Finally, the NCUA Regional Office suggested that Members 1st omit certain evidence that was "not useful in terms of demonstrating strong evidence of community" and offered specific recommendations on ways to supplement the draft application. A.R. 877.

---

[7] Thus the CAC covered the followed counties in their entirety: Adams, Cumberland, Dauphin, Lebanon, Perry, and York. In addition, although the majority of the Borough of Shippensburg is located in Cumberland County, a portion of the borough is located in Franklin County. Members 1st requested that the entire borough be included as part of the CAC.

### 4.      The February 2003 Application

In February 2003, Members 1st filed its formal application to convert its charter to a community charter serving the CAC.  In the application, Members 1st noted that "[f]or many years, numerous organizations, including the Pennsylvania state government, have designated the [SCPC] as a single, geographically well-defined area [and that] the common interest of interaction among the residents is highlighted even further in the [CAC] . . . ."  A.R. 296. Moreover, Members 1st asserted that:

> [T]he most significant interaction among the residents of the [CAC] centers around the I-83 Corridor and its numerous attractions and facilities. . . .  The I-83 Corridor allows the mere 25 miles between Harrisburg and York, the two endpoints of this corridor, to become the major trade area of this community.  With the I-83 Corridor serving as the major trade area, or hub of the Capital Area Community, the traffic volume increases significantly as it moves toward the I-83 Corridor . . . .

A.R. 296.  Finally, Members 1st provided an "addendum" to the application, which provided additional information related to commerce within the CAC.  A.R. 700.

On March 27, 2003, the NCUA Office of Examination and Insurance submitted a memorandum to the NCUA Regional Office, in which it was indicated that "[t]he credit union's independent evidence and the regional summary provided sufficient information to demonstrate that the six counties in Pennsylvania are a community."  A.R. 245.  The memorandum cited factors, including: Pennsylvania state government's recognition of the SCPC as a unit; the "community's trade areas . . . concentrated in and around the cities of Harrisburg and York"; the "ample employment opportunities in both Harrisburg and York"; the presence of Harrisburg Community College; and the "numerous organizations, interscholastic athletics, and entertainment venues which facilitate interaction among residents."  A.R. 246.

14

On March 31, 2003, the NCUA General Counsel's Office submitted a memorandum to the NCUA Regional Office, in which it concluded that Members 1st's "proposed charter conversion meets the requirements for a local community charter."  In support of its conclusion, the General Counsel's Office stated that:

> First, there are clearly defined geographic boundaries, namely, six contiguous counties.  Second, the evidence submitted includes information regarding two major trade areas, employment patterns, two local airports, a community college, community events, a local newspaper, and local organizations and clubs.  All of theses factors together demonstrate that the proposed community charter meets the requirement of being "a well-defined area where individuals have common interests or interact."

A.R. 243-44.

Thereafter, the NCUA Regional Office submitted its recommendation to approve the conversion request.  In support of its recommendation, after a factor-by-factor review, the Office stated that

> Pennsylvania government provides support and oversight to community residents through regional planning and governmental districts.  A majority of the workforce is employed within the community, and a majority of the residents live within a 25-mile radius of the community's midpoint.  It has a central major trade area, consisting of the community's two largest cities, Harrisburg and York, connected by a major interstate, I-83.  The Harrisburg-York trade area draws residents from throughout the community for business, shopping, employment, and entertainment. The community has an international and a reliever airport, shared facilities, organizations, clubs, events, area newspaper, and recreation. Combined, these demonstrate area residents have common interests and/or interact.  The application contained sufficient independent support to establish [that the] proposed community is a well-defined community, as outlined in the Chartering and Field of Membership Manual (IRPS 99-1, as amended), Chapter 2, Section V.A.2.

A.R. 24.

On March 28, 2003, the NCUA Regional Office submitted a Board Action Memorandum recommending that the NCUA Board formally approve the application.  In that Memorandum, the Regional Director cited factors that indicated common interest or interaction, including: that "Pennsylvania government provides support and oversight to community residents through regional planning and government districts"; that "[a] majority of the workforce is employed within the community, and a majority of the residents live within a 25-mile radius of the community's midpoint"; that "[t]he community's trade area consists of a centralized hub, anchored by its two largest cities, Harrisburg and York, connected by a major highway, I-83"; and that "[i]t has a community airport, shared educational facilities, organizations, clubs, events, area newspaper, and recreation."  A.R. 10.

### 5.    The April 24, 2003, NCUA Board Meeting

Finally, on April 24, 2003, the NCUA Board considered and unanimously approved Members 1st's February 2003 application requesting approval to convert its charter to a community charter covering the CAC.  During the Board meeting, after the Regional Director made her recommendation of approval, the individual members expressed their views on the application.  Chairman Dollar indicated that although the CAC is "one of those where many times people may look at it and say, 'that's a fairly large community with six counties and two MSAs and over a million people,' in our working with [Members 1st], their initial request actually encompassed a larger area than that. . . . [W]e helped them come to a much more documentable community here."  A.R. 4.  Chairman Dollar explained that, in light of the existence of the regional planning districts, the CAC "is clearly recognized by the Commonwealth of Pennsylvania as an interactive community and a community that has those

16

ties." Id.  In addition, he stated that "Harrisburg and York, of course, compose the major central trade area there, but it's really the I-83 running through there that almost provides a corridor, and I think most of us who have made that drive up to Hershey and on into the Amish country and the like have seen just how that is an area that has melted together largely as a result of that development along that I-83 corridor." A.R. 4-5.  Finally, he expressed that Members 1st "felt they could serve more, but we didn't feel like it met the interaction standard.  We now have a community that does.  They were willing to give up [some of their members] in order to make that difference." A.R. 6.

Next, Board Member Johnson stated that the factor she found "most compelling is the fact that Pennsylvania government views this area as one unit and, therefore, provides support and oversight to the community residents through their regional planning and their governmental districts." A.R. 6.  She also noted that "another compelling factor is that the area has a major trade area consisting of the two cities of Harrisburg and York, which are 25 miles apart connected by a major road, Interstate 83.  These two cities serve as the area's center for business, employment, entertainment, and shopping." A.R. 6-7.  Finally, she "found evidence of common interests and interaction in that 69 percent of the area residents work in the community, many in the manufacturing industries." A.R. 7.

The last to speak, Board Member Matz, agreed that "[f]or all the reasons that my colleagues cited, I believe there is strong evidence that this area is a community," A.R. 7, and moved for approval of Members 1st's charter conversion request, A.R. 8.  After Board Member Johnson seconded the motion, it was approved.  A.R. 8.

    **C.**    **Procedural Background**

Plaintiffs brought this action against the NCUA in 2005 to challenge the approval of the community charters.  (Doc. No. 1.)  Plaintiffs thereafter filed an amended complaint (Doc. No. 10), and the NCUA filed an answer to the amended complaint (Doc. No. 15).  After the Court granted a motion allowing Members 1st, New Cumberland Federal Credit Union, and AmeriChoice Federal Credit Union (the "Credit Unions") to join as intervening Defendants (Doc. No. 13), the Credit Unions answered the amended complaint. (Doc. No. 18).

After extensive briefing by the parties, the Court issued an order concerning the applicable standard of review and the scope of discovery.  (Doc. No. 43.)  In that order, the Court held that the appropriate standard for judicial review of the NCUA's decision was the arbitrary and capricious standard set forth in § 706(2)(A) of the APA and that supplemental discovery was not available under the APA.  Following that order, the Court directed the parties to file cross-motions for summary judgment.  (Doc. No. 46.)  The parties filed the cross-motions, submitted briefs in connection with the motions (Doc. Nos. 48-57, 60, 62-63, 66-68) and the Court held oral argument.[8]

## II.    STANDARD OF REVIEW

As this Court previously held, § 706(2)(A) of the APA governs the scope of judicial review in this case.  Am. Bankers Ass'n v. NCUA, 513 F. Supp. 2d 190, 205 (M.D. Pa. 2007).  Section 706(2)(A) provides that a reviewing court shall "hold unlawful and set aside agency

---

[8] In addition, Defendants filed motions to strike (Doc. No. 58, 64) several exhibits submitted by Plaintiffs.  At oral argument, Plaintiffs indicated that, consistent with the Court's previous order, review should be generally limited to the administrative record.  For the purposes of adjudicating the order, the Court does not rely on any of the disputed exhibits, and therefore the motions to strike will be denied as moot.

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Judicial review of administrative actions under the arbitrary and capricious standard is highly "deferential."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. —, 127 S. Ct. 2518, 2529 (2007).  The scope of review is "narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicles Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Nevertheless, the court must "engage in a substantial inquiry" of an agency's decision, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971), and vacate the decision if the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  State Farm, 463 U.S. at 43.

## III.   DISCUSSION

To a casual observer familiar with central Pennsylvania, it would likely be a remarkable finding that the CAC—a geographical area of more than 3,000 square miles with a population over 1.1 million people and encompassing Harrisburg, Hershey, Carlisle, York, Lebanon, Gettysburg, and Shippensburg—constituted a "well-defined local community."  But the Court is not tasked with making such a finding.  Rather, as this Court previously explained, the Court must decide whether the NCUA's finding to that effect is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  § 706(2)(A).

The inquiry under the arbitrary and capricious standard is deferential and the scope of review is circumscribed.  The Court finds, however, after a careful review of the record, that the NCUA's analysis is insufficient in this case for two reasons.  First, the NCUA failed to provide an explanation for discrediting evidence contrary to its finding that there is a single trade area in the CAC.  Second, the NCUA failed to provide an explanation for changing its course when considering the existence of multiple political jurisdictions.  The Court will address each reason in turn.

### A.     The NCUA failed to consider evidence in the record that is contrary to its conclusion that there is a single trade area

The Court must ensure that "in reaching its decision, the agency  examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  Prometheus Radio Project v. FCC, 373 F.3d 372, 389-90 (3d Cir. 2004) (internal quotation marks omitted).  It is, therefore, a settled principle of administrative law that "an agency is generally under at least a minimal obligation to provide adequate reasons explaining why it has rejected uncontradicted evidence."  Soltane v. United States Dep't of Justice, 381 F.3d 143, 151 (3d Cir. 2004).  Thus, in order to survive judicial review, an agency must "provide some explanation for a rejection of probative evidence which would suggest a contrary disposition" and "consider all the evidence and give some reason for discounting the evidence [the agency] rejects."  Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994) (vacating decision for failure to meet "substantial evidence" standard); see also Sevoian v. Ashcroft, 290 F.3d 166, 174 (3d Cir. 2002) (stating that when the arbitrary and capricious "standard of judicial review is applied to a factual issue in an informal administrative decision, it is functionally equivalent to the substantial evidence standard.").

Here, one of the most significant factors in the NCUA's decision is the identification of the I-83 corridor as the major trade area in the CAC.  Although the NCUA gave careful consideration to Members 1st's narrative summary, there appears to have been little consideration or critical analysis of the evidence in the record that is contrary to the NCUA's conclusion.  In particular, with respect to shopping and employment patterns, there is ample evidence that weighs against the conclusion that there is a single trade area.

First, with regard to shopping, the evidence relied upon by the NCUA is at best incomplete, and at worst, self-serving.  In its application Members 1st asserted that "all the major shopping malls [in the CAC] are found along the I-83 corridor . . . [and that] with all nine of the [CAC's] transportation corridors filtering towards the I-83 Corridor, residents possess easy access to these shopping facilities and interact at these malls on a daily basis . . . ."  A.R. 700.  Yet, while Members 1st identified only six major malls in its narrative summary, with two malls near York and four near Harrisburg, the record identifies almost *two dozen* shopping centers within the CAC.[9]  The NCUA makes no mention of other shopping centers within the CAC, creating the impression that there simply are none; the record suggests otherwise.

Members 1st also relied heavily on the presence of specific stores at the malls to bolster its assertion that residents travel "up and down" the I-83 corridor to "satisfy a specific shopping need."  A.R. 700.  However, the narrative summary's reliance on essentially anecdotal evidence

---

[9] Harrisburg East Mall, York Galleria, Colonial Park Mall, West Manchester Mall, York Commons, Paxton Towne Center, Capital City Mall, Camp Hill Shopping Mall, Colonial Commons, Lebanon Valley Mall, Lebanon Plaza Mall, Delco Centre, Carlisle Plaza Mall, Manchester Crossroads, Queensgate Shopping Center, Hanover Crossing Shopping Center, Union Square, The Point Shopping Center, Gateway Square, The Outlets at Hershey, and Gettysburg Village Factory Stores.  A.R. 1337.

of shopping patterns is notably selective.  For example, Members 1st stated that Barnes & Noble

Booksellers, a bookseller, and Zany Brainy, a children's education store, could only be found at

Camp Hill Mall, near Harrisburg.  Meanwhile, the record shows that B. Dalton sold books and

magazines at the two malls near York, and Waldenbooks did so at three malls near Harrisburg.

A.R. 703-704.  By way of further example, Members 1st noted that "of the [six major] malls

listed above, Old Navy and Eddie Bauer [purveyors of men's and women's apparel] can only be

found at the Capital City Mall [near Harrisburg]."  A.R. 701.  The record shows that the Gap and

American Eagle Outfitters sold men's and women's apparel at five of the six malls.  A.R. 704.

Despite the obvious selectivity of Members 1st's narrative summary, the NCUA Regional Office

parroted the narrative to reach the conclusion that "residents of Harrisburg, York, and the

surrounding community travel up and down I-83 to satisfy specific shopping needs unique to

each mall."  A.R. 17.

Moreover, when reconsidering the SCPC application, the NCUA commented that

"although there are numerous small shopping centers located adjacent to highways in many parts

of the community, Lancaster County attracts the largest number of shoppers."  A.R. 1110.  At

that time, the NCUA concluded that the existence of Park City Center, a "super-regional

shopping center" located in Lancaster, "greatly diminishes the concept of one major trade area

for the entire community."  Id.  In the final analysis, though, the NCUA assumed away the

presence of shopping opportunities outside of the CAC.

Beyond shopping, the NCUA found that employment patterns supported a finding that

the I-83 corridor served as the major trade area of the CAC.  Specifically, the NCUA found that

"[r]esidents in the community area have significant opportunity for interaction through their

places of employment" and that almost 70% of the labor force worked within the CAC.  A.R. 17.

The NCUA described the existence of a "heavy concentration of manufacturing industries in the

center of the [CAC]," based on large employers near Harrisburg and the almost 1,000

"manufacturing operations" found in the "southern portion of the community."  A.R. 18.  The

NCUA further noted the existence of a "construction site for the largest grocery warehouse

facility in the world" between Harrisburg and York, and indicated that, near York, there are

major industrial parks.  Id.  Finally, the NCUA found it significant that "[m]any of the

community area's residents and their families take advantage of factory tours offered by the

employers in the Harrisburg-York trade area . . . ."  Id.

The record also indicates, however, that the NCUA's earlier analysis with respect to

SCPC found that comparing "county of residence versus county of employment shows the

majority of residents commute to work within the county in which they live."  A.R. 1164, 1217.

Also significant is the fact that the NCUA *itself* observed during its review of the "draft"

application that:

> [T]here was no documentation regarding the percentage of
> commuters employed within the community.  If available, this may
> be an important statistic.  The analysis of the [SCPC] showed York
> County and Lancaster County each have a larger population and
> workforce than Dauphin County (Harrisburg).  Since York County is
> still in the mix, *this point must be adequately addressed.*

A.R. 878 (emphasis added).  Notwithstanding the apparent evidence that the residents of the

CAC did not regularly commute across county lines, the NCUA reported without further

discussion that there were "ample employment options and opportunity to interact."  A.R. 18.

**B.      The NCUA failed to adequately explain why the existence of governmental
           subgroups recognized is compelling evidence of interaction**

In addition to the above, the Court finds that the NCUA failed to adequately explain why the fact that, in some circumstances, Pennsylvania state government treats the SCPC as a single unit is "compelling evidence" for its decision that the CAC is a well-defined local community. This failure further buttresses the Court's conclusion that the NCUA's decision was arbitrary and capricious.

When Members 1st applied to convert its charter to cover the eight-county SCPC, it claimed that Pennsylvania state government treated the SCPC as a single planning unit.  In support of its claim, Members 1st noted that the SCPC served as a single State Planning Region and that Executive Directive No. 48, which divided Pennsylvania into "uniform geographic areas," designated the SCPC as single region.  A.R. 1130.  In addition, Members 1st noted that the South Central Assembly for Effective Governance, Regional Counter-Terrorism Task Forces, the Pennsylvania Department of Agriculture, and the Pennsylvania Department of Transportation all treated the SCPC as a single unit.  A.R. 1130-31.

At the time, the NCUA acknowledged that "[c]learly, state government views South Central Pennsylvania as one region for planning and administrative purposes."  A.R. 1108. Nonetheless, the NCUA ultimately concluded that this fact alone was *insufficient* to demonstrate common interaction.  The NCUA explained that:

> [W]ithin the region there are numerous political jurisdictions, taxing authorities, school systems, etc.  There was no evidence of cooperation among the smaller jurisdictions of the area for shared facilities and services.  Although South Central Pennsylvania is recognized by state governmental authorities, there was no discussion about what they had done as a group – projects, accomplishments, services rendered, etc., as evidence of interaction.

A.R. 1109.

Despite this rejection of the existence of a classification system used by Pennsylvania state entities, in its later application, Members 1st cited the same fact: that the state government in Pennsylvania recognizes the SCPC as a single governmental subunit for certain purposes. Unlike its earlier statements, in the final analysis, the NCUA Board found this fact to be "compelling" evidence of interaction and common interest.

Contrary to the reasoning of its own analysis, it its final decision, the NCUA simply ignored the existence of "numerous political jurisdictions, taxing authorities, school systems, etc." Failing to explain how the existence of these entities undermines its conclusion that the CAC constituted a well-defined local community. A.R. 1109. Neither did the NCUA explain why the recognition of SCPC, a *larger* area, as a single unit make the slightest bit of difference with respect to the CAC, a smaller area ultimately found to be a well-defined local community.

It is questionable whether a reasoned decisionmaker could find that a classification scheme found to be inadequate evidence of interaction in the first application could transmutate into compelling evidence of interaction in the last. Even if a reasoned decisionmaker could have made such a finding, the NCUA provided no basis for doing so beyond bare assertion. The NCUA argues that a good explanation for the NCUA decision exists: Members 1st submitted more evidence to the NCUA in its later applications.[10] That may be; however, as this Court previously noted, the propriety of an agency's decision must be judged "solely by the grounds invoked by the agency." Am. Bankers Ass'n v. NCUA, 513 F. Supp. 2d 190, 200 (M.D. Pa. 2007). There is no indication in the agency's final analysis that the outcome was driven by

_____

[10] The Association invites us to speculate about a less savory explanation—a change in personnel responsible for reviewing the application. (Doc. No. 55, at 22.)

additional data.  Accordingly, the Court cannot accept the NCUA's litigation position as proof of the agency's contemporaneous reasoning.

The APA requires a reviewing Court to ensure that an agency engaged in reasoned deliberation.  The NCUA's failure to justify its volte-face prevents the Court from assessing whether the decision was the result of agency deliberation or whether it was simply pre-determined.  Accordingly, its decision must be set aside.

## IV.   CONCLUSION

Under the applicable standard of review, the Court can neither substitute its judgment for that of an agency nor re-weigh the evidence.  Rather, its role is to review the record as a whole and determine whether the agency's action is arbitrary and capricious in light of the record.  The Court will not disturb an agency's actions if it is evident that the decision is the product of reasoned decision-making, even if the Court would itself have reached a contrary conclusion.

The organic statute assigns to the NCUA the task of weighing the evidence before it and, after an "appropriate investigation," deciding whether a proposed area is a well-defined local community.  As illustrated above, the record contains evidence that supports the agency's findings; however, it also contains a substantial body of evidence contravening the agency's finding that the CAC constitutes a well-defined local community.  The NCUA's lopsided decision reflects a certain deafness to the unfavorable evidence in the record.  Moreover, the record is clear that the agency in this case changed its formal position with respect to the relative weight of the factors, and the agency provided no explanation for the shift.  That so much of the evidence contrary to the agency's decision went completely unmentioned hardly inspires confidence that the NCUA's decision was the product of reasoned, deliberative decision-

making—particularly where such decision-making occurs entirely *ex parte*.  That the agency

made an unexplained shift in its approach strongly suggests that determinism, not

documentation, drove the NCUA's decision.

Under all of the circumstances, the decision of the NCUA is arbitrary and capricious and

must be set aside.  Plaintiffs' motion for summary judgment will therefore be granted.  Inasmuch

as the briefs have not addressed the applicability and scope of available remedies, Plaintiffs will

be directed to submit a draft order consistent with this opinion and a brief in support of the

requested relief.  Defendants' brief in opposition and Plaintiffs' reply shall be filed consistent

with the Local Rules.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMERICAN BANKERS** | : | |
| **ASSOCIATION et al.,** | : | **Civil Action No. 1:05-CV-2247** |
|     **Plaintiffs** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **NATIONAL CREDIT UNION** | : | |
| **ADMINISTRATION et al.,** | : | |
|     **Defendants** | : | |

## ORDER

    **AND NOW**, on this 21st day of July, 2008, for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT**:

1.    Plaintiffs' motion for summary judgment (Doc. No. 53) is **GRANTED**.

2.    Defendants' motions for summary judgment (Doc. Nos. 49, 51) are **DENIED**.

3.    Defendants' motions to strike (Doc. Nos. 58, 64) are **DENIED** as moot.

4.    The parties shall have thirty (30) days from the date of this order in which to file opening briefs concerning the issue of appropriate remedy.  Attached to the brief shall be a proposed order identifying the relief sought.  The briefing schedule shall follow that set forth in the Local Rules.

S/ Yvette Kane_____
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania